IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

           Plaintiff,

      v.

SKYLER CARTER, et al.,

           Defendants.

Criminal No. 17-0217
Civil No. 20-1018

ELECTRONICALLY FILED

## MEMORANDUM OPINION

Defendant Skylar Carter has filed the instant *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence.  ECF 1080.  This Court previously sentenced Defendant to 131 months imprisonment, which was a term well below his guideline range of 262 to 327 months imprisonment.

Defendant's motion raises two issues under Section 2255: first, that he should not have received a 4-point enhancement for a leadership role; and second, that he received ineffective assistance of counsel.  Id.  The Government filed a brief in opposition to the Section 2255 motion, making this matter ripe for disposition.

I.      **Factual and Procedural History**

     A.      **The Indictments**

On August 22, 2017, a federal grand jury sitting in the Western District of Pennsylvania returned a four-count Indictment charging 17 individuals with various federal drug violations.  Defendant was charged as to count one and count two of this indictment.  On October 5, 2017, a federal grand jury sitting in the Western District of Pennsylvania

returned a six-count Superseding Indictment charging twenty-one (21) defendants with various federal drug law and firearms violations.   Defendant was charged at count one of the superseding indictment with conspiracy to possess with intent to distribute and distribute controlled substances in violation of 21 U.S.C. § 846.  Defendant was charged at count two of the superseding indictment with possession with intent to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Finally, Defendant was charged at count five of the superseding indictment with possession with intent to distribute and distribute fentanyl resulting in serious bodily injury and death in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(C).

### B.    The Plea Agreement

Defendant initially pled not guilty to these charges but on June 14, 2018, during a change of plea hearing held before this Court, Defendant pled guilty to count five of the six-count superseding indictment.  Defendant's change of plea was made pursuant to a plea agreement which was made known to this Court at the time of the hearing.

Relevant to the instant motion, the plea agreement indicates that Defendant agreed to: (1) enter a plea of guilty to count five of the superseding indictment; (2) acknowledge responsibility for the conduct charged in counts one and two of the superseding indictment; and (3) waive his right to take a direct appeal from his conviction or sentence, but nothing would preclude him from raising an ineffective assistance of counsel claim.  The plea agreement also indicates that after the imposition of sentence, the Government agreed to: (1) move to dismiss counts one and two of the superseding indictment; and (2) recommend a two-level downward adjustment for Defendant's acceptance of responsibility; and (3) to move for an additional one-level downward adjustment.  Finally, the agreement notes that if Defendant were to act in a

manner "inconsistent with acceptance of responsibility," the Government would not make (or if

already made, would withdraw) the motions/recommendations for the downward adjustments.

### C.    The Change of Plea Hearing

During Defendant's change of plea hearing, the following relevant exchanges between

this Court and Defendant occurred:

> THE COURT: Sir, do you understand that, having been
> sworn, your answers to my questions are subject to the
> penalties of perjury or making a false declaration if you do
> not answer truthfully?

> DEFENDANT CARTER: Yes, Your Honor.

> *        *        *

> THE COURT: The Court is informed that you wish to
> change the plea that you have previously entered to a plea of
> guilty at Count 5 of the superseding indictment charging you
> with possession with intent to distribute and distribution of
> fentanyl resulting in serious bodily injury and death, in
> violation of Title 21, United States Code, Sections 841(a)(1)
> and 841(b)(1)(C), and as you acknowledge your responsibility to
> the conduct charged at Counts 1 and 2 of the superseding
> indictment and agree that that conduct charged in those counts
> may be considered by the Probation Office and by this Court in
> calculating the advisory sentencing guideline range and
> imposing sentence.
> Correct, sir?

> DEFENDANT CARTER: Yes, Your Honor.

> THE COURT: The Court also notes that you acknowledge
> responsibility for distributing a quantity of fentanyl that
> resulted in the death of a person identified as AB, and that
> you agree to pay restitution as ordered by this Court.
> Correct?

> DEFENDANT CARTER: Yes, Your Honor.

ECF 1007, p. 3.

> THE COURT: The maximum sentence I'm authorized to

impose under the law including any applicable mandatory
minimums for the commission of the offense to which you intend
to plead guilty as you and the Government have agreed and as
set forth in the plea agreement is a term of imprisonment of
not less than 20 years or more [to] life, a fine not to exceed
one million dollars, a term of supervised release of at least
three years, and a special assessment of $100.

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Do you understand the potential sentence
the Court is authorized to impose?

DEFENDANT CARTER: Yes, Your Honor.

*      *      *

THE COURT: The parties also agree that the types and
quantities of controlled substances attributable to this
Defendant in this case are at least 160 grams but less than
280 grams of fentanyl, at least 280 grams but less than
840 grams of cocaine base, and at least 3.5 kilograms but less
than 5 kilograms of cocaine.
Is that correct on behalf of the United States?

MS. BLOCH: That is correct, Your Honor.

THE COURT: Defendant?

MR. JOBE: It is correct, Your Honor.

THE COURT: Do you agree, sir?

(Off the record discussion between the Defendant and his
counsel.)

DEFENDANT CARTER: Yes, Your Honor.

Id., p. 9-10.

THE COURT: What is the Government's position as to
the applicable advisory guideline range, please?

MS. BLOCH: Your Honor, the 20-year mandatory minimum
applies to the counts of conviction. The guidelines will, of
course, be calculated in part by the Probation Office based

upon the quantity of drugs, which the parties have stipulated
to as you've indicated on the record. With a three-level
reduction for acceptance of responsibility, the sentencing
guidelines would result in an offense level of 35, a criminal
history category of one, and in turn a term -- an advisory term
of imprisonment of 168 to 210 months.

THE COURT: Do you agree?

MR. JOBE: That is correct, Your Honor.

THE COURT: Do you understand, sir?

DEFENDANT CARTER: Yes, Your Honor.

Id., p. 11.

THE COURT: Do you also understand that after your
initial advisory guideline range has been determined, the Court
has authority in some circumstances to depart upwards or
downwards from the range, and the Court will also examine other
statutory sentencing factors under Title 18, United States
Code, Section 3553(a) that may result in the imposition of a
sentence that is either greater or lesser than the advisory
guidelines sentence?

DEFENDANT CARTER: Yes, Your Honor.

Id., p. 12.

THE COURT: I have before me the original plea
agreement which has been marked as Government Exhibit No. 1.
Sir, I direct your attention to Page 5 of the document. Is
that your signature, sir?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Counsel, your signature?

MR. JOBE: That is correct, Your Honor.

THE COURT: Sir, did you read and review the entire
agreement with your counsel before you signed it?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Correct, counsel?

MR. JOBE: That's correct, Your Honor.

THE COURT: Do you understand all of its terms and content?

DEFENDANT CARTER: Yes, Your Honor.

Id., p. 13.

THE COURT: Do you understand I'm not bound by any recommendation of sentence your attorney and/or the Government may have suggested or agreed to, nor by the Government's agreement not to oppose your attorney's requested sentence, if any, and that the Court could sentence you up to the maximum sentence permitted by the statute?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: And I'm correct that the maximum permitted under the statute is life, correct?

MS. BLOCH: That is correct, Your Honor.

THE COURT: Correct?

MR. JOBE: That is correct, Your Honor.

THE COURT: Understand?

DEFENDANT CARTER: Yes, Your Honor.

Id., p. 14.

THE COURT: Now, would you on behalf of the United States summarize the Government's evidence as to this charge.

MS. BLOCH: Certainly, Your Honor.

The Government's evidence, if it were to proceed to trial, would include testimony in particular by agents of the FBI who conducted the investigation resulting in Mr. Carter's arrest on June 28th. As the Court is aware, this particular

investigation began in part as a wiretap investigation during which a number of wiretaps were authorized by the Court; and simultaneous surveillance was conducted of the area in and around Clairton, Pennsylvania, particularly where Mr. Carter and his co-conspirators did business. Mr. Carter was one of the primary targets of that investigation and, as such, much of the wire interception was of his telephone and text interactions with the members of this conspiracy.

The Government's evidence would further include both physical evidence and testimony of various witnesses that would establish that during the time period charged in Count 1 of the indictment, that is approximately March, and in this case through the end of June, Mr. Carter distributed a number of drugs; most importantly, as it relates to Count 5, he distributed fentanyl.

And during the period as reflected in Count 5, that is May 1st to June 5th, the Government's evidence would indicate that most of the fentanyl, if not all of the fentanyl, he possessed for distribution purposes was acquired from his co-defendant and co-conspirator Elliot Page. He had received regular purchases from Mr. Page; interactions between the two of them were intercepted; and specifically as it relates to those dates, that is May 1st to June 5th, there was further interception that indicated that there were a number of individuals, to include his co-defendant in this Count, one Katie Spratt, who was purchasing quantities of both cocaine and fentanyl for further distribution in the area.

The Government's evidence would reflect that shortly before June 5th of 2017 Ms. Spratt made a purchase of both cocaine and fentanyl from Mr. Carter which she then distributed to others; most importantly, on June 5th she distributed a quantity of both cocaine and fentanyl to AB, now known as Andrew Bracken, who died on that particular date.

Witness information -- the FBI acquired witness information in and around the -- once Mr. Bracken was found deceased. Witness information, specifically to the City of Pittsburgh police officers, helped in amassing sufficient evidence to obtain a search warrant of Ms. Spratt's home. The Government's evidence would include some of the seizures found in her home, which were specifically bags or glassine baggies marked with the stamp Pepsi in red. From Mr. Bracken's person

7

there was a seizure of Pepsi bags as well from his pocket, as well as one recovered from around his person that still had fentanyl in it.

In addition, the Government's evidence would reflect that on top of the Pepsi bags which matched those found on Mr. Bracken there were a significant quantity of owe sheets indicating Ms. Spratt's drug trafficking activities. Thereafter, they were able to -- the agents were able to sort of go back and review various wire interceptions to further establish not only that Ms. Spratt had made a purchase from Mr. Carter prior to the June 5th death of Mr. Bracken, but also helped to establish Ms. Spratt's activities as there was not a wire ongoing on her telephone.

Additionally, the Government would present photographs of Ms. Spratt's car both at her residence, but also at the Bracken residence shortly before Mr. Bracken consumed both the cocaine and fentanyl she distributed to him from which she obtained from Mr. Carter.

As you might imagine, there was a significant number of lab analysis conducted of various -- of some of the physical evidence seized as well as from Mr. Bracken himself. The Government would present the testimony of Dr. Shakir, spelled S-H-A-K-I-R, who is the deputy medical examiner at the Allegheny County Medical Examiner's Office, who conducted a thorough pathological diagnosis of Mr. Bracken and determined, in fact, that Mr. Bracken was a 29-year-old male who died as a result of the combined toxicity of both cocaine and fentanyl. The Government would present further evidence of the lab results of the various packages of Pepsi bags seized both from Mr. Bracken as well as Ms. Spratt and determined, in fact, that they contained fentanyl to the extent that there was any drug left behind.

On June 28th Mr. Carter was arrested along with a number of his co-defendants; and there were also search warrants executed at that time at various locations, one of which was the location where Mr. Carter was found, which was his brother Courtney Carter, who is also his co-defendant, and Eugene Reddick, who at least as of this time is still named in this particular indictment as a co-defendant.

During the search -- during the execution of that search, additional packages both marked Pepsi as well as

stamped with the word Creed were seized from the residence. This is one of the residences, Your Honor, that you've heard much about that -- one of three that Mr. Carter used as either storage locations for his drugs, packaging locations, or locations from which drugs were distributed. Those particular packages as well were examined, all of which contained fentanyl.

I think that is essentially, Your Honor, the Government's evidence.

THE COURT: Sir, in a moment I will ask you whether you agree with the Government's summary of what you did. But, first, do you understand your answers may be later used against you in the prosecution for perjury or making a false statement if you do not answer truthfully? [This was the **second** time Defendant was asked if he understood he had to testify truthfully.]

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Do you agree with the prosecution's summary of what you did?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Are there any additions or corrections you wish to make?

DEFENDANT CARTER: No, Your Honor.

Id., p. 17-21.

THE COURT: Did you make this decision to plead guilty of your own free will and voluntarily?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Do you understand everything I've discussed with you today?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Have you ever had any physical or mental illness that affects your ability to understand this proceeding or my explanation of your rights?

DEFENDANT CARTER: No, Your Honor.

THE COURT: Counsel, do you have any doubt about the Defendant's competency to plead guilty?

MR. JOBE: I do not, Your Honor.

THE COURT: Sir, are you completely satisfied with your attorney's advice and representation?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Has he done everything you've asked him to do?

DEFENDANT CARTER: Yes, Your Honor.

THE COURT: Is there anything he's done you believe he should not have done?

DEFENDANT CARTER: No, Your Honor.

Id., p. 22.

### D. The Presentence Investigation Report

Near the end of the change of plea hearing, this Court ordered the probation office to prepare a presentence investigation report ("PSR"). On August 29, 2018 the PSR was filed and indicated that Defendant's base offense level was "38," and also deducted a total of three points for acceptance of responsibility. ECF 796, p. 8-9. Defendant's total offense level would have been "35" as suggested by the Government during the change of plea hearing; however, the probation officer, relying on United States Sentencing Guideline § 3B1.1, adjusted the offense level upward by 4, finding Defendant to be an organizer or leader of the criminal activity. Specifically, the PSR reads as follows:

20. **Adjustment for Role in the Offense**: According to USSG § 3B1.1(a), if the defendant was an organizer or leader of a criminal activity that involved five or more participants, increase by 4 levels. The defendant coordinated and obtained drugs from suppliers Elliot Page and Eugene

> Reddick; supplied drugs to lower level members of the conspiracy, such as Katie Spratt; and enlisted the assistance of family members Courtney Carter and Jalea Carter in his drug trafficking activities. For example, he used their residences to store, package and stamp heroin and fentanyl, to cut and cook cocaine, and to conduct drug transactions. Therefore, four levels are added because the defendant was an organizer or leader of the conspiracy. USSG §3B1.1(a).

Id., p. 9.

Once the PSR was filed, the probation officer allowed time to pass for the parties to object to anything set forth in the PSR.  On September 18, 2018 the probation officer filed an addendum noting that neither the Government nor Defendant had filed any objections or requested that any additions or corrections be made.  ECF 853.

### E.    Defendant's Objection to the PSR and Motion for Departure

On June 26, 2019, Defendant filed objections to the PSR.  ECF 998.  His first objection Defendant stated:

> The Defendant objects to +4 adjustment contained in paragraph 20 of the PSR pertaining to the defendant Carter's role in the conspiracy as being characterized as an organizer or leader. While defendant Carter readily takes responsibility for his role in the conspiracy, the characterization of the defendant Carter's role can best be described as minor given the fact that the defendant did not package any of the drugs or directly distribute any drugs to the overdosed victim. The defendant vehemently denies that he ever knew that fentanyl was being packaged and that he conspired to sell such a substance. The defendant readily acknowledges that he knew about the existence of heroin and cocaine distribution but knew nothing regarding the existence of fentanyl. Additionally, the defendant Carter accepts responsibility for essentially "middle manning" the distribution but certainly was not a leader or organizer in that regard. Consequently a +4 adjustment should not be applicable to defendant Carter.

Id. at ¶ 2.

Defendant's second objection was to paragraph 69 of the PSR.  In this objection, Defendant claimed that the probation officer did not consider certain mitigating factors which would warrant a downward departure from the guideline range.  Id. at ¶ 3.

On July 16 2019, Defendant filed an "amended objection to the [PSR]" at ECF 1011.  In this document, Defendant expressly withdrew the objection he filed to the +4 adjustment stating, "[Defendant] respectfully requests that his objection to the +4 adjustment contained in paragraph 20 of the PSR be WITHDRAWN and concedes that paragraph 20 of the PSR is accurate." ECF 1011.  However, he did not withdraw his objection to paragraph 69 of the PSR, remaining resolute in his argument that various mitigating factors needed to be considered, thus warranting a downward departure form the guideline range.

After considering the Probation Office's supplemental addendum to the presentence investigation report (ECF 1013), this Court denied Defendant's motion for downward departure based on the various mitigating factors raised by Defendant.  ECF 1014.  However, the Court noted in its Order denying the downward departure that it would take the mitigating factors into account and would consider them as a request for downward variance during Defendant's sentencing hearing.  Id.

### F. Defendant's Sentencing Hearing

On July 18, 2019, the Court held Defendant's sentencing hearing.  ECF 1015 and ECF 1089.  During the sentencing hearing, Defendant's girlfriend and several family members testified on his behalf.  ECF 1089.  The Court also received numerous letters from persons who wrote on Defendant's behalf.

In sentencing Defendant to 132 months imprisonment and three years of supervised release, the Court noted that it was granting Defendant's request for a downward variance from the guideline range[1] and further explained its reasons for the sentence imposed as follows:

> THE COURT: Thank you.
> I'm correct that the offense level is 39 and criminal history is I.
> Correct?
>
> MS. BLOCH: I have that set forth. Yes, that is correct.
>
> THE COURT: Correct?
>
> MR. JOBE: Yes, Your Honor.
>
> THE COURT: Understand, sir?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: For the reasons that the Court will set forth in a few moments, the Court does find that a downward variance from the advisory sentencing guidelines is appropriate in this case.
>
>         \*       \*       \*
>
> First, the nature and circumstances of the offense. This was a large-scale investigation into the drug trafficking in the Clairton, Pennsylvania area revealed that the defendant was a leader or organizer of a trafficking, drug trafficking conspiracy in the Clairton area. The defendant obtained distribution quantities of fentanyl and cocaine from co-defendants Eugene Reddick and Elliott Page, and then enlisted the help of two of his siblings and another co-defendant in his drug trafficking activities. The defendant used his sibling's residence to store, package and stamp, heroin and fentanyl, cut cocaine and to conduct drug transactions.
> At defendant's request, Courtney Carter also made drug deliveries and collected payments from the defendant's

---

[1] Defendant's guideline range of 262 - 327 months imprisonment was based upon his offense level of 39 and a criminal history score of I.  ECF 797.  The Court's sentence of 131 months imprisonment reflects a downward variance in imprisonment.

customers. Defendant also used Terrence Wade as a drug runner on a regular basis.

The investigation also produced evidence that on or about May 1, 2017, defendant supplied a quantity of fentanyl and cocaine to co-defendant Katie Spratt, S-P-R-A-T-T, which she then distributed to her friend and drug user, A.B., which caused his drug overdose death.

The parties have stipulated that the type of controlled substances attributable to defendant is at least 160 grams but less than 280 grams of fentanyl and at least 280 grams but less than 840 grams of cocaine base and at least 3.5 kilograms but less than 5 kilograms of cocaine.

Secondly, the Court has considered defendant's personal characteristics and his family, criminal and social history.

As we heard here this morning, the defendant has spent a substantial part of his life with his fiancée and has helped raise her children. He has no children of his own. He's approximately 38 years old.  He does not have any adult criminal history other than three summary offenses for disorderly conduct, all of which were drug related. Defendant has had for a substantial period of time a substance abuse problem. Until his arrest, he smoked marijuana daily, used cocaine several times a week, and took a number of Percocet pills daily. He has never participated in drug abuse treatment, but we have provided for such treatment while he's incarcerated. The rest of his background information is set forth in the PSI and I'll incorporate it herein.

Third, the Court has considered the kinds of sentences available for this offense, the sentencing guideline range under the advisory guidelines and applicable policy statements adopted by the sentencing commission.

Fourth, the Court has considered the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, including defendant's co-defendants in this conspiracy. On behalf of the government, does my statement of reasons adequately address all objections, concerns and issues?

MS. BLOCH: It does, Your Honor.

THE COURT: On behalf of the defendant?

MR. JOBE: It does, sir.

THE COURT: Understand, sir?

14

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are there any other sentencing factors under 3553(a) that the Court has failed to address?

MS. BLOCH: There are not.

MR. JOBE: None, Your Honor.

THE COURT: Understand, sir?

THE DEFENDANT: Yes, Your Honor.

ECF 1089, p. 19, 23-26.

## II.    Standard of Review

Section 2255 of Title 28 of the United States Code provides that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Whether to conduct a hearing on a petitioner's motion brought pursuant to 28 U.S.C. § 2255 is within the sound discretion of the District Court. *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008); *United States v. Day*, 969 F.2d 39, 41 (3d Cir. 1992) (quoting *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)).  In exercising that discretion, "the [C]ourt must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.  Further, the court must order an evidentiary hearing to determine the facts unless the motion, files, and records of the case show conclusively that the

movant is not entitled to relief." *Day*, 969 F.2d at 41-42 (citation omitted).  *See also* Rules Governing Section 2255 Proceedings, Rules 4 and 8.  The Court must view the factual allegations in the light most favorable to the Petitioner.  *Government of the Virgin Islands v. Weatherwax*, 20 F.3d 572, 574 (3d Cir. 1994) (district court erred in failing to conduct evidentiary hearing on petitioner's non-frivolous allegations of ineffective assistance of counsel) (subsequent history omitted).

However, if the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted in support of a Section 2255 motion, or if the movant would not be entitled to relief as a matter of law even if the factual predicates as alleged in the motion are true, an evidentiary hearing is not required.  *See Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985).


### III. Defendant's 2255 Motion

Turning to Defendant's Section 2255 Motion, the Court finds for the reasons set forth in this Memorandum Opinion, based upon a review of Defendant's Section 2255 Motion, and records in this case, Defendant's Section 2255 Motion is without merit, and an evidentiary hearing is unnecessary. [2]

#### A.  The 4-Point Offense Level Enhancement for Leadership Role

Defendant's Section 2255 Petition first contends that he should not have been subjected to the 4-point enhancement for his leadership role in the offense.  ECF 1080, p. 4.  Defendant

---

[2] Based on Defendant's petition, the Government's brief, the record, the Court's own knowledge of this matter, and the facts of this case as discussed more thoroughly herein, this Court finds Defendant's allegations are without merit and wholly unsupported by the record. Therefore, no evidentiary hearing is required because the record establishes that Defendant is not entitled to the relief sought.

argues that he "never gave orders nor directed anyone to anything under [his] authorization, [he] never had power over anyone's actions or decisions." Id.

First, Defendant's argument that he should not have been assigned a 4-point offense level ("4-level") enhancement for a leadership role in the offense, is not a valid basis upon which to raise a Section 2255 claim. His claim that he should not have been subjected to the 4-level enhancement is an issue that cannot be raised for the first time, as a collateral attack to his sentence under Section 2255. *See, United States v. Guzman,* 2021 WL 104731, (M.D. Pa. January 12, 2021). Defendant did not appeal his sentence (which incorporated the 4-level enhancement into his offense level).[3] Thus, he may not raise this issue via a Section 2255 petition with the goal of reducing his term of imprisonment.

Second, Defendant's counsel initially filed an objection to the 4-level enhancement for Defendant's leadership role in the offense. ECF 998. However, his counsel withdrew this objection shortly thereafter. ECF 1011. Thus, the record illustrates that Defendant and his counsel were aware of the 4-level enhancement as well as its impact on Defendant's sentencing guideline range, and at one time objected to its application, but later, reconsidered the position and formally withdrew the objection.

Third, this Court additionally would deny Defendant's purported claim for ineffective assistance of counsel as to the 4-level enhancement, noting (again) that counsel considered and objected to the 4-point enhancement, but later withdrew it. Counsel's withdrawal of the objection to the 4-level enhancement is not evidence of ineffective assistance.

Fourth, the Court also notes that during the change of plea hearing Defendant admitted

---

[3] Defendant's plea agreement precluded Defendant from raising an appeal unless one of three conditions was applicable. None of the three conditions existed so as to enable Defendant to raise his 4-level enhancement on appeal.

that he essentially obtained drugs from his suppliers, and that he, in turn, then supplied those drugs to others, such as Katie Spratt, who then sold the drugs to decedent, "A.B."  Defendant also admitted during the change of plea hearing that he used the homes of his family members to store, package, and stamp heroin and fentanyl, and to cook and cut cocaine, as well as to conduct his drug transactions.  The Court found at the time of sentencing Defendant, and continues to find, that these actions illustrate Defendant's role an organizer or leader in the conspiracy, and thus, warrant the 4-level enhancement.  Based upon Defendant's admissions during his change of plea hearing, and given the fact that he did not raise the 4-level enhancement at the time of sentencing (after having formally withdrawn his objection (svee ECF 1011) to this enhancement), nor on appeal, Defendant's Section 2255 claim as to the 4-leel enhancement is meritless.

Finally, during the sentencing hearing, before pronouncing his sentence, the Court announced that Defendant's guideline range was based upon an offense level of "39" (which included the 4-point offense level enhancement) and criminal history score of  "I."  ECF 1089, p. 19.  Counsel for Defendant and the Government agreed with this Court that "39" and "I" were the appropriate offense level and criminal history score upon which to base Defendant's guideline imprisonment range.  Id.  When asked if he understood , Defendant himself acknowledged the offense level  of "39" and the criminal history score of "I" during the sentencing hearing.  Thus, hearing no objection by Defendant nor his counsel to the offense level of "39" – which included a 4-level enhancement for Defendant's leadership role – Defendant's guideline range was set at 262- 327 months imprisonment.

## B. Ineffective Assistance of Counsel

Defendant's second claim set forth in his Section 2255 petition is ineffective assistance of counsel, wherein Defendant claims his attorney promised he would have guideline sentence reduced by "60%." The Court finds that this claim is likewise meritless.

In support of his ineffective assistance claim, Defendant argues that his counsel "continuously told [him] that there would be a 60% reduction in his sentence so at that moment [Defendant] decided to go through with sentencing. Up to that point the strategy was to possibly pull the plea . . .".

Defendant's own argument belies the veracity of this claim. He claims that his attorney "continuously" reassured him he would receive a 60% reduction in his sentence, but then, in the same sentence, Defendant suggests that only at the very moment his attorney assured him of the 60% reduction, did Defendant agree "to go through with the sentencing" and not withdraw his guilty plea.

More importantly, during the change of plea hearing this Court specifically asked Defendant if anyone had promised him what his actual sentence would be. Defendant responded "No" assuring this Court that no one had made any such representation. In addition, at the change of plea hearing the Court asked Defendant if he understood that no matter what the initial advisory guideline range was deemed to be (as determined by his counsel and the Government), the Court would have the authority to depart upwards or downwards from the range, and the Court will consider other statutory sentencing factors under 18 U.S.C. § 3553(a) which could result in the imposition of a sentence that is either greater or lesser than the advisory guidelines sentence. Defendant responded that he did so understand.

In addition, Defendant stated during the change of plea hearing that he was satisfied with

his representation by his attorney.  He reiterated this again when the Court asked him during the sentencing hearing.  Specifically, Defendant indicated that his attorney had done everything he asked him to do and stated that there nothing his attorney had done that he thought the attorney should not have done.  ECF 1007, p. 22.  Thus, among other things, the Court was satisfied that Defendant approved of both, his attorney's decision to file and the withdrawal of the objection to the 4-point enhancement of his offense level for his leadership role in the offense.

Finally, before the sentencing hearing, the Court denied a downward departure which Defendant's counsel filed on Defendant's behalf, arguing that numerous mitigating factors need to be considered and used to adjust Defendant's sentence downward.  However, because of this motion filed by Defendant attorney for a downward departure, the Court was made aware of these factors well in advance of the sentencing hearing, and further indicated in its order that it would consider counsel's downward departure arguments at the time of sentencing as a request for a downward variance.  During the sentencing hearing, the Court announced that it would indeed grant Defendant a downward variance given the arguments raised by his counsel, specifically his ties to the community as well as his family accounts and obligations.  ECF 1089, p. 19, 23-26.  In granting Defendant a downward variance, the Court adjusted Defendant's sentence downward by half, from the lowest end of the guideline range (262 - 327 months) so that Defendant will serve 131 months imprisonment.

Thus, Defendant's current sentence (131 months imprisonment, which reflects a 50% reduction of the lowest end of his guideline range) was imparted by this Court due to Defendant's counsel filing a motion for downward departure, and the Court's willingness to consider counsel's valid arguments on Defendant's behalf as a request for downward variance. Accordingly, this Court finds no evidence of ineffective assistance of counsel.

**IV.  Conclusion**

Based upon the foregoing, the Defendant's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence (ECF 1080) will be denied.  Further, a certificate of appealability will not issue because Defendant has failed to "make a substantial showing of the denial of a constitutional right."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(2).

An appropriate order follows.


s/   Arthur J. Schwab _____

United States District Judge


cc:      All ECF Registered Counsel of Record
                and
         Skylar Carter
         38499068
         FCI-McKean
         Federal Correctional Institution
         P.O. Box 8000
         Bradford, PA  16701